[File No. 6173.]

NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellant, v. NORTHERN REO COMPANY, a Corporation, et al., Respondents.

(250 N. W. 329.)

Opinion filed July 17, 1933.   On rehearing October 10, 1933.

*Conmy, Young & Conmy,* for appellant.

*Lawrence, Murphy, Fuller & Powers,* for respondents.

BURKE, J.   On the 20th day of September, 1928, the plaintiff, Northern Pacific Railway Company, leased to the defendant, Northern

Reo Company, for a term of twenty years, all of that portion of said railway station grounds at said station (Fargo, North Dakota) lying between Front street and a line parallel with and distant 70 feet northerly thereof and between the easterly line of 4th street and a line parallel with and distant 72 feet easterly thereof, at an annual rental of $325.00. The lease provides that "the lessee will occupy and continue to use the premises during the term of said lease for the purpose of maintaining thereon an automobile warehouse and no other."

. As early as October, 1928, the said defendant was seeking a modification of his contract to permit the installation of a filling station. On October the 2nd, 1928, J. L. Watson, right-of-way commissioner of the plaintiff railway company, wrote a letter to the defendant regarding certain modifications in the short term lease, which are not involved, but among other things, he said, "As to permitting an oil filling station on the premises: I have taken that matter up with our people and they are not willing to consent to it for the reason that we have repeatedly declined applications of the Standard Oil Company, the Texas Company and others, to permit filling stations on our right of way at Fargo and other points, and to make an exception in this case would greatly embarrass us with other companies whose applications we have declined." This was even before the lease had been finally accepted. The said defendant, with knowledge that the plaintiff would not permit a filling station at that place and knowing the reason why it could not, erected a very substantial two story building and basement, occupied and used the same as an automobile warehouse under the terms of the lease.

On August 22, 1931, Mr. Polis, president of the defendant company, wrote to the said Mr. Watson, in which he said: "Now, Mr. Watson, if you will give me permission to install a filling station on the corner of my building, I will then ask you for a bulk station lease on your right-of-way and erect tanks on your line, thereby giving you an added freight of from eight to ten cars of gas every month. I am making this application to you to allow me to install this gas station, and hope you will be able to use your good influence in making a recommendation for me in my behalf. I would certainly appreciate your efforts, in this matter, as there are several good months ahead for the sale of gas."

On August 31, 1931, Mr. Watson answered this letter as follows: "I took the matter up with our people here, but I am unable to get them to agree to modify your lease so as to permit the operation of a filling station on the premises because we have frequently declined applications of the Standard Oil Company and some of the other large oil companies to operate filling stations at Fargo and other points on . . . (our line)."

On failure to get permission to install a filling station by his own efforts, he interested Hon. Alex Stern, president of the Dakota National Bank of Fargo and also president of a surety company, and a big business man of long standing in the city of Fargo, and on June 10, 1932, Mr. Stern wrote to Mr. Watson requesting a reconsideration of the subject of securing a modification of the contract, so as to permit a filling station in the building, and under date of June 14, 1932, Mr. Watson replied, stating: "I again took the matter up with the Executive Department for further consideration of the request of Mr. Polis. They are unwilling to consent to a filling station being installed in the building because we have repeatedly declined to permit the Standard Oil Company, the Texas Company, the Midwest Refining Company and other oil companies on our right of way, to maintain filling stations on the premises. You may recall the difficulty we had with the Standard Oil Company a few years ago when they installed filling pumps in the Matt Murphy building, with the result that we required these pumps to be taken out. Our people feel that if we made an exception other tenants would demand similar concessions and threaten us with loss of business if we should not comply, and they are not willing to make an exception and permit a filling station in the Northern Reo building."

Thereafter Mr. Polis and Mr. William Stern, who is also prominent in business and public life and vice-president of the Northern Reo Company, went to St. Paul to consult with the railroad officials, and after a conference between Mr. William Stern and Mr. Clark, Mr. Watson, on July 1, 1932, wrote to Mr. Stern as follows: "In accordance with your request made today to Mr. Clark and the subsequent talk I had with him, the Northern Reo Company will be permitted to install in their building on premises at Fargo covered by lease No. 46119 a gasoline pump, or pumps, for servicing cars in the Northern

Reo Company's building, similar to the service pump, or pumps, and the use made thereof, in the Mitchell Chevrolet Company's building at Fargo and the Moorhead Motor Company's building at Moorhead." Copy of this was sent to Mr. Polis, president of the Northern Reo Company, a copy to Mr. Clark, Mr. Capron and Mr. Hein.

The trial judge finds as facts that "while the defendant's request was still being continuously refused by the plaintiff's officers and agents, the defendant continued to plan to remodel its building so as to install gasoline pumps and a service station in connection with its business, apparently in the hope that permission would eventually be granted to it. It had plans drawn for remodelling the building, contractors submitted estimates thereon, foundaries planned and submitted estimates for tankage and other material. . . . Immediately on receipt of this letter (the letter from Mr. Watson, exhibit 15) the defendant continued its preparations with great alacrity and contractors and material men speeded up the changes and improvements to a high degree."

As soon as Mr. Watson learned that the said defendant was installing a real public filling station he wired Mr. Stern on July 19: "Please stop all work on filling station Reo building until matter can be taken up with R. W. Clark who will return St. Paul Friday or Saturday. This is imperative. Hope you will comply."

On July 23, 1932, he wrote Mr. Stern: "I am instructed to advise you that the Railway Company will not permit the installation of a filling station, or filling pumps, for selling gasoline at retail, in the Northern Reo Company's building on the Railway Company's right of way at Fargo, and the permission granted in my letter of July 1, 1932, must be confined to the installation of a pump, or pumps, for the exclusive servicing of cars while in said building, and plans of the proposed installation should be submitted to the Railway Company for its approval before proceeding with the work. This matter has been given careful consideration by the Railway Company and I trust that if any work has been done on the installation of a filling station in the building for the selling of gasoline at retail, such installation will be stopped."

On July 26, Mr. Clark wired Stern: "Do not understand Polis' action in persisting in going ahead in connection with alteration of his building in distinct violation of understanding I had with you, namely,

that he would agree to installation of pump or pumps to service cars. It is evident to me that at all times he intended to so rearrange his building as to enable him to do filling station business, because his application with the city authorities of Fargo plainly states that he was planning to engage in general filling station business. I pointed out to you and later to your father our inability to waive rule now in effect which prohibits installation of filling station in buildings on our right-of-way and I do not understand why Polis persists in going ahead. Is there not some way that you can get Polis to confine his changes to those which we are willing to approve. Please wire me St. Paul."

Again on August 12, Mr. Clark wired Mr. Stern as follows: "Does Polis intend to comply strictly with terms of our authorization or is he intending to ignore that understanding and install public filling station? Does Polis understand that we have not given him permission to establish filling station in his building? Please reply by wire." Under date of August 13, Mr. William Stern wired to Mr. Clark: "Have spoken to Polis half dozen times to comply with your authorization. . . ." August 13, Clark wired to Polis: "You have copy of Mr. Watson's letter to Mr. William Stern dated July first stating that we would permit Northern Reo Company to install in their building a gasoline pump or pumps for servicing cars in your building. . . . Do you understand that we have not given you permission to establish a public filling station on these premises?"

In the trial court's findings of fact is the following: "What has the defendant done? Briefly, it has spent several thousands of dollars in making alterations, reconstruction and substantial improvements, and which are not only in the wall of its building above the sidewalk line, but it has made similar costly construction and change in its basement and sub-basement. The next result is that the greater portion of its building facing on Front Street, together with the adjacent opening facing on Fourth Street, now constitutes a very elaborate gasoline filling station, oil depot and tire supply, making this building as a whole what is advertised on the outside thereof, a complete 'One Stop Service.' To be more exact, it will be noticed by referring to exhibit 23 (a photograph) that that portion of the building facing on Front Street begins where it abuts or adjoins the Gamble-Robinson building with a portion of brick resting directly against the wall of that building; then comes

an ordinary doorway with a supporting pillar on the west side thereof; then came a very large plate glass window; then another pillar; then there was another equally large plate glass window; then another pillar with a plate glass window about three-fifths the size of the two last mentioned filling in between this last pillar and the pillar that makes the first story corner of the building at its southwest corner. By referring to Exhibit 4, which represents an unlighted daytime photograph of the reconstructed building, it will be noticed that the small doorway first mentioned remains and is seen just at the extreme edge of the picture. All of the remaining plate glass construction, together with the supporting wall therefor across the remainder of this entire frontage, has been removed, together with the large central brick pillar, and this wall has been set back into the building several feet and reconstructed as a new wall or partition between the driveway left after its removal and setting back and the present office and show rooms. The wall has been set in far enough beyond the wall line so that automobiles may cross the sidewalk and pass through between the re-set partition or wall and the two remaining pillars at the corner and near the corner of the southwest part of the original building. Between these latter pillars, approximately in line with the inside thereof, are set three oil pumps, and back against the new partition are set three more pumps. Further along the new partition there is room for various signs, tire and lubricating oil racks. This newly constructed driveway is wholly open to the Front Street side except as to the two remaining of the old supporting pillars, the one at the corner of the building and the one just east thereof. In lieu of the supporting pillar removed, steel I-beam construction has been placed overhead. A beautiful and rather elaborate advertising lighting system has been constructed over and about the entrance on each street and extending down the corner of the building and the sides of the entrances and doorways, and an electric sign carrying the word 'Gas' also extends out over the sidewalk on the Front Street side. All of these improvements have been very well shown by the photographer in the several exhibits on file. Several large gas tanks with thousands of gallons capacity have been sunk in the sub-basement and much massive and extensive cement work has been added in the basement and other parts of the building to properly fit the altered construction. A large amount of money has been expended and valu-

able improvements made and if these may not stand the defendant will suffer much loss."

Again the court finds: "But with the most liberal construction favorable to the defendant, the cold facts are that it appears to have greatly exceeded its authority and permission in making the alterations complained of. It was never the intention of the plaintiff or its officers to permit the construction of what is ordinarily known as a public gasoline filling station on this corner and there is nothing in the authorization to have warranted the defendant in so doing. Plaintiff was not only within its rights in so using its property as to not offend and alienate other large shippers whose business either individually or in bulk was of far greater value than that of defendant, but it is naturally interested, of course, in seeing to it that these structures on its right of way and near right of way property are not of a trivial or transient nature, but of a character which would be likely to warrant long-time leases at very low rates in view of the business to be produced thereby. The evidence shows, for instance, that the rental value of a small portion of these premises now used as a filling station was worth for such purpose at least $1,800.00 a year, while the defendant pays but $325.00 a year and taxes for ground rent on the whole of its twenty-year lease. There was no warrant to defendant for tearing out the Front Street wall of its building and setting it back underneath the second story so as to make a filling station driveway wholly open to the outdoors as it did, and if the defendant continues in the position that it is entirely within its rights as its improvement now stands, then this Court must grant the relief prayed for by the plaintiff to the extent of requiring the defendant to wholly eliminate from the outdoors all instruments, paraphernalia and insignia of a filling station and without permission to service cars with oil or gas on the outside of its building through any connection with the inside thereof.

" . . . In view of the apparent equities of the case and so as to render defendant's improved situation comparable with that of the Mitchell Chevrolet building on which, after all, its permission is based, the Court is willing and believes that in the interests of justice, equity and good conscience a decree should be made at the option of the defendant permitting the defendant to replace and reinstall its wall fronting Front street, glazed as fully and completely as before the removal

of that wall, leaving the new opening or doorway on the west side of the building at the southwest corner thereof as it now is so as to make the same doorway when the south wall shall have been reconstructed, and further permitting the construction of a doorway at any point the defendant may desire on the south or Front street side of the building, with proper and adequate driveways leading thereto from Front street over and across the sidewalk so that ingress and egress may be had through such doorway by automobiles from Front street and so that they may pass into the building from Front street and out thereof onto Fourth street, or vice versa. . . ."

Judgment was entered upon the findings and the plaintiff appeals.

If there is any one thing that appears clear in this record it is that the plaintiff and defendant never came to an agreement modifying the terms of the original lease. It is clear that the plaintiff never intended and never agreed to modify the original lease so as to permit the erection of a public filling station, and it is equally clear that Mr. Polis, president of the Northern Reo Company and acting for it, never intended anything but a public filling station. He never asked for anything but a public filling station, and while he complained about permission being given to the Moorhead Motor Company and the Mitchell Chevrolet Company to service cars with gas and oil in their building, he, at the same time, was having plans and specifications drawn and made for the building of an elaborate public service station, and immediately upon receipt of the letter, exhibit 15, he began the installation of such a station. He did not accept the offer or plan permitted by the plaintiff, but immediately proceeded on the execution of his own plans, undoubtedly with the expectation, that if he got the filling station installed, the plaintiff would acquiesce. He paid no attention to the telegrams or letters from the plaintiff company, demanding that he desist and stop work. Mr. William Stern, who secured for Polis the letter, exhibit 15, asked him a half dozen times to comply with the letter without avail. Mr. Ed. Conmy, as attorney for the plaintiff, talked to Mr. Polis and he told Conmy that he had received a letter from Mr. Watson, but he would not stop work, and when told that an action would be brought, he said; "Go ahead and bring the action."

The trial judge finds specifically that "it was never the intention of the plaintiff or its officers to permit the construction of what is ordi-

narily known as a public gasoline filling station on this corner and that there is nothing in the authorization to have warranted the defendant in so doing." He might have found that it was never the intention of the defendant, Northern Reo Company, acting through Mr. Polis, to install anything but a public filling station. There is absolutely nothing in the record to indicate that the Northern Reo Company was willing to install service similar to the service in the Mitchell Chevrolet Company building, but on the contrary it is clear that that is not the kind of service that the Northern Reo Company wanted and that nothing would satisfy the said defendant short of a public filling station.

Mr. Polis knew better than the trial judge knows that "it was never the intention of the plaintiff or its officers to permit the construction of what is ordinarily known as a public gasoline filling station," and he knew that exhibit 15 did not authorize him to install such a filling station.

The trial judge also finds specifically that the defendant, Northern Reo Company, without authorization, made such changes in the building that "the net result is that the greater portion of its building facing on Front street, together with the adjacent opening facing on Fourth street, now constitutes a very elaborate gasoline filling station, oil depot and tire supply, making this building as a whole what is advertised on the outside thereof, a complete "One Stop Service," and that the rent of the plaintiff's property in this place with a gasoline filling station installed would be $1,800.00 per year, while the defendant, the Northern Reo Company, was paying $325.00 per annum for the use of the premises under the terms of the lease.

The judgment permitting the defendant, at its option, to replace and restore its wall fronting Front street, glazed as fully and completely as before the removal of that wall, leaving the opening or doorway on the west side of the building at the southwest corner thereof as it now is and permitting the construction of a doorway at any point the defendant may desire on the south or Front street side of the building, would still leave a public filling station in the Northern Reo Company's building. There would be an opening on the south and an opening on the west and automobiles could drive in from the south or from the west as they now do and the replacing of the plate glass would not inconvenience the public at all. The space which would be occupied by the

glass when restored is not necessary for the driveway and the filling station in the corner of the building, facing an international highway, on a very busy corner, would be in plain view through the plate-glass and through the openings on the south and the west.

Such judgment would afford no relief whatever to the plaintiff. Exhibit 15 is a mere gratuitous permit, or license, never accepted, or acted upon, by the defendant the Northern Reo Company, and whatever expense was incurred was incurred on the execution of its own plans without authority.

Under § 7213, Compiled Laws, 1913, preventive relief may be given by injunction (1) When pecuniary compensation would not afford adequate relief.

The plaintiff is entitled to the relief demanded in its complaint, namely: that the defendant be permanently enjoined and restrained from erecting and operating a public service gasoline station in the Northern Reo Company building on the premises at Fargo covered by lease number 46119 and for its costs and disbursements in this action, and it is ordered that judgment be entered accordingly.

NUESSLE, Ch. J., and CHRISTIANSON, BURR and BIRDZELL, JJ., concur.

BURKE, J. (On rehearing.) A rehearing was granted on the petition of the defendant. In the petition, and also in the argument on rehearing, defendant claims that the court overlooked certain important testimony upon which the defendant bases his defense. This is the testimony of Mr. Clark, found on pages 71 and 72 of the transcript and which is as follows:

"Mr. Clark: I was familiar with the fact that in the Mitchell Chevrolet building they had access through the building from the front to the rear. Mr. Stern said to me that in Mr. Polis' building the only entrance into their work shop where they could sell gasoline was a door from the side street, which is Fourth street, and that they had to back out after they got in there; and he said that they would want to open up a front door so that they could pass through like they did in the Mitchell Chevrolet building.

"The Court: What did you say about that?

"A. Well, I don't recall that I made any answer, because I was not protesting as to what he should do with his building so far as the structure or appearance was concerned. I was dealing only with the question of a public filling station in there.

"The Court: You didn't care if he did cut another door through there?

"A. Well, no."

Mr. Watson's testimony at page 184 of the transcript is as follows:

". . . He (Mr. Stern) asked me to go down and take a look at the building. We went down there, we were alone at first, and I think later on we were joined by Mr. Polis. And they pointed out some of the improvements they would like to have made, such as the cutting of doors, as I recall, in the front of the building, and after looking over the thing Mr. Stern and I went back to his office and he wrote a letter, addressed it to me, renewing his application for a filling station site."

We did not overlook this testimony but we considered that it was not important on the issues in the case. Watson was taken to the building by Mr. Stern and they said something to him about cutting a door in the front of the building. It was the defendant's building and it could make any improvements therein that it desired and the plaintiff could not object, so long as the defendant did not use the building for a forbidden purpose. The use of the premises for a public filling station was forbidden and in every conference between the plaintiff and the defendant, and the plaintiff and representatives of the defendant, the plaintiff made it clear that a public filling station would not be allowed. Mr. Clark said: "I was familiar with the fact that in the Mitchell Chevrolet building they had access through the building from the front to the rear. Mr. Stern said to me that in Mr. Polis' building the only entrance into their work shop where they could sell gasoline was a door from the side street, which was Fourth Street and they had to back out after they got in there; and he said that they would want to open up a front door so that they could pass through it like they did in the Mitchell Chevrolet building." That is the request that was made to Clark by Mr. Stern, in behalf of the defendant. They already had a door on the west side into the service part and wanted a door in the

front so that they could pass through like they did in the Mitchell Chevrolet building, but as soon as the defendant got permission (exhibit 15) authorizing the servicing of cars, as in the Mitchell Chevrolet building and the Moorhead Company building at Moorhead, they moved the entire front wall of the first story back and installed therein a public filling station. The entire end of this space on the west is open, except the northwest corner support and the entire south is open, except the supporting pillars and this space is used for no purpose except as a public filling station. Neither the plaintiff nor this court can say that the defendant must close this space, but the court can say, and does say, that this space cannot be used for a public filling station and if the defendant wants to use it for servicing cars in his garage, it will be necessary to reconstruct it in such a way that it cannot be said to be a public filling station.

On re-argument counsel for the plaintiff stated that if the filling station signs were removed, the open space at the west end enclosed and the space on the south enclosed, except a ten foot door, giving an opening into the garage on the south so that cars could pass in from the south and out through the door on the west mentioned in the conversation between Mr. Clark and Mr. William Stern, there would be no objection on the part of the plaintiff.

The defendant cannot be required to change the appearance of his building in any way, but if he wants to use this property to service cars brought to his garage, it will be necessary for him to change the outside appearance of the building so that it will not have the appearance of a public filling station.

The decision as rendered is adhered to.

BIRDZELL, Ch. J., and NUESSLE, CHRISTIANSON and BURR, JJ., concur.